# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

RUBY L. BURNEY, :

                Plaintiff,

  -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,
                Defendant. :

Case No. 3:07-cv-419

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986). Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365 (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984). However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner, supra.* If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion. *Elkins v. Secretary of Health and Human Services*, 658 F.2d 437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520 . First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Plaintiff filed applications for SSD in January, 1999, January, 2001, and August, 2001, all of which were denied at the administrative level and Plaintiff took no further appeal of those denials. (Tr. 51-52; 57-60; 61-64; 97-99; 53-54; 65-68; 71-73).

Plaintiff filed applications for SSD and SSI on July 31, 2003, alleging disability from July 1, 2001, due to knee, back, and foot impairments and headaches. (Tr. 100-02; 819-21; 144-53). Plaintiff's applications were denied initially and on reconsideration. (Tr. 74-77; 79-81; 823-36; 829-32). A hearing was held before Administrative Law Judge Melvin Padilla, (Tr. 833-68), who determined that Plaintiff is not disabled. (Tr. 17-38). The Appeals Council denied Plaintiff's request for review, (Tr. 10-12), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that she has severe degenerative disc disease in the lumbar spine with residuals of surgery in 2004, degenerative disc disease of the cervical spine, residuals of surgery on the right knee in 2001, obesity, adjustment disorder with mixed features, and alcohol abuse disorder, but that she does not have an impairment or combination of impairments that meets or equals the Listings. (Tr. 24, ¶ 3; Tr. 29, ¶ 4). Judge Padilla also found that Plaintiff has the residual functional capacity to perform a limited range of light work. (Tr. 30, ¶ 5). Judge Padilla then used sections 202.12 through 202.15 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr 36, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits

under the Act. (Tr. 38).

Plaintiff has a history of being hit by a car in 1997, and since then she has experienced musculoskeletal problems. *See, e.g.,* Tr. 357. An October, 2000, CT of Plaintiff's lumbar spine revealed mild central canal narrowing at L4-5, disc protrusion at L5-S1 causing mild compression of the right nerve rootlet, and osteoarthritic degenerative changes of the facet joints at multiple levels. (Tr. 344-45). A CT scan performed in August, 2001, revealed diffuse disc bulges at both L4-5 and L5-S1, moderate right neural foraminal stenosis, and mild narrowing of the right neural foramen. (Tr. 384). During the period October, 2000 - March, 2001, Plaintiff participated in physical therapy. (Tr. 500-26).

On July 25, 2001, Plaintiff underwent a video arthroscopy, lateral release, partial synovectomy with chondroplasty and debridement of her right knee which Dr. King performed. (Tr. 372-73). An April, 2002, x-ray revealed mild degenerative spurring of Plaintiff's right knee. (Tr. 413).

Examining physician Dr. Neely reported on October 22, 2001, that Plaintiff had give away weakness throughout all muscle groups in the upper and lower extremities, decreased sensation in the right median nerve, normal reflexes, positive Tinel and Phalen's signs in the right wrist, normal ranges of motion of the upper and lower extremities, and an antalgic gait. (Tr. 389-94). Dr. Neely also reported that Plaintiff's cervical, thoracic, and lumbar spine active ranges of motion were within normal limits and that her diagnoses were chronic neck and back pain secondary to degenerative joint and disc disease, right C5 radiculopathy, right median nerve neuropathy consistent with carpal tunnel syndrome, right knee pain secondary to patellar subluxation and arthritis, and likely hypertension. *Id.* Dr. Neely opined that Plaintiff would be able to tolerate

5

working at a sedentary/light level of physical demand, would not have difficulty doing work-related activities which included sitting, standing, and lifting up to ten pounds infrequently, that walking and carrying should be intermittent, and that she would likely have difficulty with repetitive stooping, bending, squatting, and overhead activity. *Id.*

Plaintiff consulted with neurosurgeon Dr. McClure on July 12 and October 30, 2001. (Tr. 395-96). Dr. McClure reported in July, 2001, that Plaintiff complained of neck pain going into her right shoulder and down her right arm into her hand, that she had a head tilt to the right, weakness of the right triceps and extensor digitorum, and increased sensation over the right arm. *Id.* Dr. McClure also reported that a previous MRI revealed spondylosis at C6-7 but on the left side. *Id.* On October 30, 2001, Dr. McClure noted that Plaintiff had low back and bilateral leg pain, the right greater than the left, she limped on her right leg when attempting to walk on her toes, and that she had tenderness over her low back, positive straight leg raising on the right at 45 degrees and on the left at 50 degrees, and that her knee reflexes were equal and her ankle reflexes were absent. *Id.* Dr. McClure noted that a previous CT scan of Plaintiff's lumbar spine showed a possible disc protrusion asymmetric on the right at L5-S1, and that his impression was degenerative lumbar disc disease. *Id.*

An April 17, 2002, MRI of Plaintiff's lumbar spine revealed mild, acquired central stenosis with bilateral neural foraminal narrowing and disc bulging at L4-5 and disc bulging at L5-S1. (Tr. 410). On April 25, 2003, an MRI of Plaintiff's lumbar spine indicated severe neuroforaminal narrowing at L4-5 greater on the left, which appeared to be due to a mild broad based disc bulge and severe facet hypertrophy, a probable synovial cyst extending into the spinal canal, questionable osteophytes displacing the thecal sac to the right, mild spinal canal stenosis at

6

the L4-5 level, questionable right posterolateral disc protrusion at L4-5 and extending into the neuroforamina, multilevel facet arthrosis, and mild degenerative disc disease at L5-S1 with desiccation and mild broad based disc bulge. (Tr. 425-28).

Examining physician Dr. Oza reported on October 16, 2003, that Plaintiff was obese, had a restricted range of motion of her cervical spine, had no evidence of muscle atrophy, and that she had positive Tinel's and Phalen's signs on the right side. (Tr. 482-88). Dr. Oza also reported that Plaintiff's range of motion of her right wrist was somewhat restricted because of pain, her shoulder ranges of motion were somewhat restricted due to complaints of back pain, and that she had some tenderness on palpation of the lower cervical and upper thoracic spine and the lower lumbar spine. *Id.* Dr. Oza noted that Plaintiff had some paravertebral paralumbar muscle spasm on the left side, positive straight leg raising at 30 degrees on the left and at 45 degrees on the right, that her ranges of motion at her hips were restricted due to complaints of back pain, and that she complained of pain on flexion and extension of the right knee. *Id.* Dr. Oza also noted that he could not really test Plaintiff properly for ligament instability of her knee because she complained of being in pain and would not cooperate. *Id.* Dr. Oza noted further that Plaintiff's sensory examination was intact, her knee reflexes were 2+ but that he could not appreciate ankle reflexes, and her lumbar spine range of motion was restricted. *Id.* Dr. Oza reported that his impressions were morbid obesity, chronic back pain secondary to arthritis, facet arthrosis along with symptoms suggestive of left-sided L5-S1 radiculopathy, and arthritis in the right knee. *Id.* Dr. Oza opined that Plaintiff's abilities to walk, sit, and stand were affected by her impairments as was her ability to carry for prolonged periods of time. *Id.*

On October 25, 2003, an MRI of Plaintiff's lumbar spine revealed mild anterior

7

subluxation of L4 over L5, significant central canal narrowing at L4-5 and significant left neural foraminal narrowing increased from the previous study. (Tr. 489-90).

An EMG performed on November 14, 2003, was abnormal and suggestive of right carpal tunnel syndrome. (Tr. 493).

Plaintiff consulted with neurosurgeon Dr. Kirschman on December 11, 2003, who reported that Plaintiff's recent MRI of her lumbar spine showed rather significant central stenosis at L4-5 due to ligamentous and facet hypertrophy and lesser degenerative change throughout the lumbar spine. (Tr. 579-85). Dr. Kirschman also reported that Plaintiff's gait and station were antalgic, her motor function was intact with some antalgic weakness diffusely on the right side, she displayed no sensory abnormalities, and that her deep tendon reflexes were diffusely hypoactive bilaterally. *Id.* Dr. Kirschman noted that Plaintiff was symptomatic from lumbar stenosis with a likely superimposed painful radiculitis and he recommended conservative treatment. *Id.*

Dr. Kirschman reported on January 7, 2004, that Plaintiff had been unable to complete the course of physical therapy due to increasing symptoms, that her neurological examination was unchanged, and that she had diffuse antalgic weakness throughout the right lower extremity as well as patchy sensory loss particularly in the region of the L5 dermatome. *Id.* Dr. Kirschman subsequently performed an L4-5 laminectomy and resection of epidural cyst and he noted on March 4, 2004, that Plaintiff was doing quite well postoperatively. *Id.* However, on March 30, 2004, Plaintiff reported to Dr. Yang, her treating physician since July, 2003, that she was again experiencing low back pain. (Tr. 657-95). A May 14, 2004, MRI of Plaintiff's back revealed post-surgical changes at L4-5 as well as the presence of soft tissue seroma, possibly complicated by arachnoiditis and anterior subluxation of L4 on L5 essentially unchanged from a previous MRI. (Tr.

8

604). Plaintiff participated in a few sessions of physical therapy in November, 2004, and again in August and September, 2005. (Tr. 640-42, 771-89). Plaintiff was discharged from therapy secondary to attendance compliance. *Id.*

Dr. Yang reported on March 30, 2004, that Plaintiff's diagnoses were lumbago, lumbar disc, arthritis, hypertension, and depression, that her status was poor but stable, she was not able to stand/walk, sit, or carry/lift in an eight hour workday, and that she was unemployable. (Tr. 731-32). Dr. Yang reported essentially the same information on April 19, 2005. (Tr. 729-30). On June 1, 2005, Dr. Yang reported that Plaintiff was able to lift/carry up to five pounds occasionally, was not able to stand/walk during an eight hour workday, was able to sit for five hours during an eight hour workday, and that she was not capable of performing medium, light, or sedentary work. (Tr. 658-62).

In addition to her back impairment, Plaintiff has a history of moderate degenerative changes in her left knee, and moderate degenerative changes in all the three compartments of her right knee. (Tr. 676, 678).

Plaintiff was first evaluated at Daymont West's mental health services on June 10, 2004, at which time it was noted that Plaintiff could not work because she was responsible for her grandchildren's care and because of her back impairment, that she was preoccupied about anger with everyone who was involved with her son's death, her mood was angry, her affect was full and moderately labile, and that she was oriented and preoccupied and had circumstantial speech. (Tr. 616-39). It was also noted that Plaintiff's judgment and insight were intact, she was moderately agitated, her memory was within normal range, and that she drank beer and took more than the prescribed amount of medication when she was in pain. *Id.* It was noted further that Plaintiff had

9

a history of injuring someone when she was angry, her life was stressful at home due to the number of persons living in the house, her motivation was low, and that her diagnosis was adjustment disorder with mixed disturbances of emotions and conduct, and she was assigned a GAF of 45. *Id.* On October 26, 2004, it was noted that Plaintiff had racy [sic] thoughts, pressured speech, insomnia, mood swings, depression, anger, and irritability and her diagnosis was identified as bipolar disorder, mixed. *Id.* Plaintiff continued to attend counseling at Daymont and the focus of her treatment was on her son's death and her problems with her grandchildren. *Id.*, Tr. 737-51, 790-800. . The records from Daymont indicate that Plaintiff primarily received counseling from a social worker, that psychologist Dr. Mills reviewed the treatment notes and co-signed some of them, and that Plaintiff's medications were monitored by a psychiatrist. *Id.*

On March 7, 2006, Plaintiff's Daymont counselor reported that she had been seeing Plaintiff for one and one-half years, that her problems included depression, anxiety, unresolved grief, auditory hallucinations, anger control, racing thoughts, and mood swings, her diagnosis was bipolar disorder, mixed, and that she also had some delusional thinking although she had improved in that area. (Tr. 801-09). Plaintiff's counselor also reported that her physical pain kept her in an agitated, angry state most of the time and that she was not able to perform many work-related mental activities. *Id.* This March 7, 2006, report was also signed by Dr. Donna Mills, clinical psychologist and manager of adult services at Daymont. *Id.* On April 19, 2006, a mental health care provider from Daymont whose signature is illegible, reported that Plaintiff had marked difficulties in social functioning and three repeated episodes of decompensation. (Tr. 812-17).

Plaintiff alleges in her Statement of Errors that the Commissioner erred by rejecting Dr. Yang's opinion and by rejecting her therapist's opinion. (Doc. 12).

10

In general, the opinions of treating physicians are entitled to controlling weight. *Cruse v. Commissioner of Social Security*, 502 F.3d 532, 540 (6th Cir. 2007), *citing, Walters v. Commissioner of Social Security*, 127 F.3d 525, 529-30 (6th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2) (1997)). In other words, greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians. *Rogers v. Commissioner of Social Security,* 486 F.3d 234, 242, (6th Cir. 2007), citing *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). "A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'" *Cruse,* 502 F.3d at 540 (alteration in original) (quoting 20 C.F.R. § 404.1502). However, a treating physician's statement that a claimant is disabled is of course not determinative of the ultimate issue. *Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 213 (6th Cir. 1986). A treating physician's opinion is to be given controlling weight if it is well supported by medically acceptable clinical and laboratory techniques and it is not inconsistent with the other substantial evidence in the record. *Cutlip v. Secretary of Health and Human Services,* 25 F.3d 284 (6th Cir. 1994).

The reason for the "treating physician rule" is clear: the treating physician has had a greater opportunity to examine and observe the patient. *See, Walker v. Secretary of Health and Human Services,* 980 F.2d 1066, 1070 (6th Cir. 1992). Further, as a result of his or her duty to cure the patient, the treating physician is generally more familiar with the patient's condition than are other physicians. *Id.* (citation omitted).

While it is true that a treating physician's opinion is to be given greater weight than that of either a one-time examining physician or a non-examining medical advisor, that is only

11

appropriate if the treating physician supplies sufficient medical data to substantiate that opinion. *See, Kirk v. Secretary of Health and Human Services,* 667 F.2d 524 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983); *see also, Bogle v. Sullivan,* 998 F.2d 342 (6th Cir. 1993). A treating physician's broad conclusory formulations regarding the ultimate issue of disability, which must be decided by the Commissioner, are not determinative of the question of whether an individual is under a disability. *Id.* Further, the Commissioner may properly reject a treating physician's opinion if it is not supported by sufficient medical data or if it is inconsistent with the other evidence of record. *Cf., Kirk, supra; see also, Walters, supra.*

In declining to give treating physician Dr. Yang's opinion controlling or even great weight, Judge Padilla determined that Dr. Yang did not support his opinion with objective clinical findings and that it was inconsistent with other evidence of record. (Tr. 32). Similarly, Judge Padilla declined to give Plaintiff's treating mental health care providers' opinions controlling weight because they were not supported by the clinical evidence and were inconsistent with other evidence in the record. (Tr. 33-34). This Court concludes that the Commissioner had adequate bases for doing so.

As noted above, Dr. Yang opined that Plaintiff was unemployable. However, a review of Dr. Yang's March, 2004, and April, 2005, opinions reveals that Dr. Yang provided absolutely no objective clinical findings in support of his opinions. Tr. 729-32. In addition, when Dr. Yang offered his June, 2005, opinion, the only positive finding he documented was tenderness in her low back. (Tr. 658-62). Further, a review of Dr. Yang's treatment records shows that they contain few, if any, objective clinical findings but rather, primarily contain recitations of Plaintiff's subjective complaints. (Tr. 657-95).

12

Dr. Yang's opinion is also inconsistent with the opinions and findings of the other medical experts of record. First, the Court notes that no other medical expert has opined that Plaintiff is disabled by her alleged exertional impairments. In addition, although he noted a few positive objective findings, examining physician Dr. Neely opined that Plaintiff was capable of performing sedentary and light work. Further, examining physician Dr. Oza reported that while Plaintiff had some positive findings, she was not cooperative with the examination and her abilities to perform work-related activities were, at worst, "affected by her impairments". Finally, Dr. Yang's opinion is inconsistent with the reviewing physicians' opinions as to Plaintiff's residual functional capacity. (Tr. 527-35; 566-71). Under these facts, the Commissioner did not err by rejecting Dr. Yang's opinion that Plaintiff is unemployable.

Plaintiff argues next that the Commissioner erred by failing to give the proper evidentiary weight to the opinions of her treating mental health experts.

First, the Court notes that a counselor is not a "treating source" and, therefore, a counselor's opinion is not entitled to controlling weight. *See* 20 C.F.R. §§ 404.1502, 404.1527(a)(2). Of course, the Commissioner may look to a counselor's opinion in determining an individual's limitations as the result of a mental impairment.

In rejecting Plaintiff's mental health care providers' opinions that Plaintiff is not capable of performing most work-related mental activities, Judge Padilla determined that the opinions were not supported by clinical findings, were apparently based on an incomplete clinical picture of Plaintiff's impairments, and not supported by other evidence of record.

As noted above, a review of the clinical notes, including the notes from Plaintiff's counselor and psychiatrist, reveals that the focus of Plaintiff's treatment with her counselor was with

13

respect to her anger about her son's death as well as her frustrations and problems related to raising her grandchildren. In addition, the clinical notes reveals that Plaintiff's treatment was conservative in nature consisting of counseling sessions and medications. Plaintiff never required hospitalization for treatment of her alleged mental impairment nor was hospitalization ever recommended. Further, although there are references in the record to Plaintiff's use of marijuana and cocaine and her abuse of prescription medication and alcohol, (Tr.614, 632, 633, 635; 816, 845; 846), aside form notations in Plaintiff's intake record, her Daymont counselor's treatment records do not reflect Plaintiff's use of substances. Finally, although Plaintiff's psychiatrist opined that Plaintiff has marked limitations in social functioning and has experienced three or more episodes of decompensation, the record fails to reveal any such limitations or episodes. Rather, Plaintiff reported that she cares for her two teenaged grandchildren, travels by bus when necessary, does laundry at a laundromat, goes shopping, cooks, does puzzles, watches television, listens to music, attends church less than seven times per month, and has a boyfriend. (Tr. 838-59; 634).

Under these facts, the Commissioner had an adequate basis for rejecting Plaintiff's counselor's and psychiatrist's opinions.

Our duty on appeal is not to re-weigh the evidence, but to determine whether the decision below is supported by substantial evidence. *See, Raisor v. Schweiker,* 540 F.Supp. 686 (S.D.Ohio 1982). The evidence "must do more than create a suspicion of the existence of the fact to be established. ... [I]t must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *LeMaster v. Secretary of Health and Human Services,* 802 F.2d 839, 840 (6th Cir. 1986), *quoting, NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939). The Commissioner's decision

14

in this case is supported by such evidence.

It is therefore recommended that the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to benefits under the Act be affirmed.

April 1, 2009.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).